**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TAMMI JO MOORE,**

      **Plaintiff,**

**v.**                                       **Case No.: 2:17-cv-01391**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 16, 17).

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests

remand of the Commissioner's decision; that the Commissioner's motion for judgment on the pleadings be **DENIED**; that the decision of the Commissioner be **REVERSED**; that this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On July 19, 2013, Plaintiff Tammi Jo Moore ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of May 1, 2000, (Tr. at 348-60), due to "back problems, dizzy spells, depression, and shingles," (Tr. at 390). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 196, 204). Claimant filed a request for an administrative hearing, which was held on October 30, 2015, before the Honorable Sabrina M. Tilley, Administrative Law Judge (the "ALJ"). (Tr. at 117-45). During the hearing, Claimant amended her alleged onset date to June 30, 2013. (Tr. at 120). By written decision dated December 14, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 96-109). The ALJ's decision became the final decision of the Commissioner on January 4, 2017 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 16), the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 17), and Claimant filed a reply, (ECF No. 22). Consequently, the matter is fully briefed and

ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old at the time that she filed the instant applications for benefits, and 43 years old on the date of the ALJ's decision. (Tr. at 376). She completed high school and communicates in English. (Tr. at 389, 391). Claimant previously worked as a grocery clerk, home health aide, and teacher's aide. (Tr. at 140-41).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative

3

Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 98, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since June 30, 2013, the amended alleged onset date. (Tr. at 98, Finding No. 2). At the second step of the

evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, plantar fasciitis, heel spur, and obstructive sleep apnea. (Tr. at 98-99, Finding No. 3). The ALJ also considered Claimant's median neuropathy in her wrists, type II herpes, thyroid problems, dizziness and vertigo, and mental impairments, but concluded that such impairments were non-severe. (Tr. at 99-102).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 102, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with occasional lifting/carrying of 10 pounds, frequent lifting/carrying of less than 10 pounds, standing and/or walking of two hours in an eight-hour workday; and sitting six hours in an eight-hour workday. She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can occasionally balance and stoop, but never kneel, crouch, and crawl. She can perform occasionally overhead reaching and frequently, but not continuous handle finger and feel bilaterally. She can tolerate occasional exposure to extreme temperatures, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards. She retains the capacity to understand, remember, and carry out instructions for the completion of simple, unskilled tasks. She can respond appropriately to interactions with co-workers, supervisors, and the general public. She can make adjustment to changes in the work routine.

(Tr. at 103-107, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 107, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 107, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger

individual aged 18-44 on the alleged disability onset date, (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 107, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including a document preparer, product inspector, and surveillance system monitor. (Tr. at 107-08, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 108, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant contends that the ALJ's RFC determination that Claimant could occasionally balance and did not require a sit/stand option is not supported by substantial evidence, thus rendering the ALJ's step five denial of benefits without support. (ECF No. 16 at 8). Claimant states that there is not sufficient evidentiary support for the ALJ's RFC determination because the ALJ did not state why she did not adopt the opinion of the consultative examiner, Miraflor G. Khorshad, M.D., that Claimant needed to alternate sitting and standing and could not balance. (*Id.* at 11). Claimant notes that such functions are of critical importance because the vocational expert testified during the administrative hearing that a limitation to sitting for 30 minutes at a time or an inability to balance precluded work activity. (*Id.*).

In response to Claimant's challenge, the Commissioner argues that the jobs the ALJ relied upon at step five do not require balancing according to the Dictionary of Occupational Titles (DOT). (ECF No. 17 at 11). Further, the Commissioner contends that the ALJ's discussion of the medical evidence and Claimant's daily activities allows

6

for meaningful review as to why the ALJ concluded that Claimant did not require a sit-stand option. (*Id.* at 16-17).

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

On June 7, 2013, a MRI was taken of Claimant's brain to evaluate her complaints of dizziness and vertigo. (Tr. at 507). It showed mild, non-specific white matter changes and was otherwise unremarkable. (*Id.*). The same month, on June 25, 2013, Claimant presented to Clay County Primary Health Care, Inc., with continued complaints of dizziness and lightheadedness. (Tr. at 564). She stated that the episodes occurred over the past several years, but were lasting longer. (Tr. at 566). She was referred to neurology. (*Id.*). However, before Claimant saw a neurologist, she presented to the emergency room at the Summersville Regional Medical Center on June 30, 2013 complaining of dizziness for the past month and noting that she had a history of an inner ear problem. (Tr. at 513). Her physical examination was normal. (Tr. at 515). The clinical impression was vertigo and she was referred to an ear, nose, and throat specialist. (*Id.*).

On July 2, 2013, a MRI was taken of Claimant's neck to evaluate her complaints of dizziness, but the results were normal. (Tr. at 568). Later in the month, on July 18, 2013, Claimant presented to D.R. Lough, M.D., at Ear Nose and Throat Associates of Charleston for her third visit due to her complaints of a spinning, off-balance sensation. (Tr. at 738); *see* (Tr. at 756-58, 760-68). Claimant stated that the vertigo began on April 23, 2013 and was occurring intermittently and frequently with episodes

7

lasting for four minutes. (*Id.*). Claimant confirmed that she was symptom-free between episodes. (*Id.*). Like her previous visits, Claimant's examination was normal. (Tr. at 739-40); *see* (Tr. at 756-58, 760-62). Claimant was placed on a low sodium diet, Dyazide daily, and migraine vertigo treatment was to be considered. (Tr. at 740).

On July 22, 2013, Claimant presented to her primary provider for follow-up regarding her various physical conditions. Claimant stated that her back pain, which began after she fell in 2012, was now moderate and sharp. (Tr. at 575). It was relieved by changing positions, applying heat, and sitting on a padded seat, but was worsened by sitting or flexing her back. (*Id.*). On examination, Claimant did not have any weakness, numbness, or tingling in her extremities and she was ambulating normally. (*Id.*). Claimant reported that she was referred for pain management, but could not go because it was denied by her insurance company. (*Id.*). She asked for a prescription for the non-steroidal anti-inflammatory drug (NSAID) Mobic because it provided her relief in the past. (*Id.*). Claimant further stated that she still had the worsening dizziness and ringing in her ears. (*Id.*). She noted that her psychiatrist took her off Zoloft to see if the symptoms would cease, but she did not notice a change. (*Id.*). She was awaiting her neurology appointment. (*Id.*).

On August 20, 2013, Claimant saw neurologist Glen Goldfarb, M.D., to evaluate her dizziness. (Tr. at 591). Claimant stated that the issue began in 2010 after a motor vehicle accident that caused "fluid in [her] ear." (*Id.*). It was worse since June 2013 and caused vertigo, nausea, and lightheadedness, which was relieved by lying down. (*Id.*). Claimant stated that the symptoms could last hours or days and she also experienced tinnitus. (*Id.*). Claimant's physical examination was largely normal, including normal deep tendon reflexes, heel and toe walking, sensation, and strength testing. (Tr. at 593).

8

The plan was to try a low dose of Valium and continue the benzodiazepine Restoril at night since it was helping. (*Id.*).

On September 19, 2013, Claimant saw Dr. Lough for her monthly follow-up appointment and reported that she was doing better. (Tr. at 765). The following day, Claimant presented as a new patient to Brian Scott Yee, D.O., for tail bone pain that was chronic over the past couple of years, but was gradually increasing. (Tr. at 584). Claimant stated that the only possible cause of the pain that she could think of was that many years ago, when she was working as a home health aide, a patient fell and she fell along with the person. (*Id.*). Claimant described that her tailbone pain "came and went" and sitting, riding in a car, or any pressure on the area increased the pain. (*Id.*). Claimant stated that she had to constantly shift positions. (*Id.*). Claimant also related her history of arthritis, bilateral hip pain, and narrowing between the vertebrae in her spine. (*Id.*). She explained that she was treated by another provider and pursued physical therapy until she lost her insurance. (*Id.*). Claimant stated that she was in pain 75 percent of the time and it was relieved by lying down and worsened by sitting or standing, but it was unchanged by walking. (*Id.*). An x-ray was reviewed of Claimant's sacrum and coccyx. (Tr. at 587). Claimant was also examined and had minimal tenderness in the paraspinal muscles, tenderness over her sacroiliac joints, and significant tenderness in the sacral coccygeal region. (Tr. at 588-89). Her muscle strength was normal with a negative straight leg raising test and her reflexes and sensation were intact, but her Patrick's tests were positive bilaterally.[1] (Tr. at 589). The assessment was that Claimant suffered from sacroilitis, lumbar disc degeneration,

---

[1] "The (Patrick's) FABER Test stands for Flexion, Abduction and External Rotation. These three motions combined result in a clinical pain provocation test to find pathologies at the hip, lumbar and sacroiliac region." https://www.physio-pedia.com/FABER_Test

lumbar spondylosis without myelopathy, and coccydynia. (*Id.*). Claimant was scheduled for a right lumbar nerve block injection. (Tr. at 587, 589).

On September 23, 2013, Claimant followed up with Dr. Goldfarb. She reported that her symptoms were better on Valium and her treatment plan was continued. (Tr. at 594). The following year, on January 18, 2014, Claimant presented to Montgomery General Hospital stating that she "pulled a muscle or something in her lower back" and was suffering hip pain as well. (Tr. at 672). The pain began two days prior, but Claimant stated that she did not suffer any recent injury. (Tr. at 673). An x-ray of Claimant's lumbar spine and left hip showed pseudo arthritis on the right with attempted sacralization at L5, but there were no other issues. (Tr. at 688).

On March 20, 2014, Claimant saw Dr. Lough and stated that she was doing the same with no improvement. (Tr. at 781). Later that month, on March 31, 2014, Claimant presented to Community Care of West Virginia regarding chronic lumbar pain. (Tr. at 805). Claimant noted that she was treated by the Center for Pain Relief and was scheduled for facet injections, but had since lost her insurance. (*Id.*). She had tenderness to palpation of her spine and hips, as well as pain elicited by motion. (Tr. at 806). Her motor strength and neurological examinations were normal except that her Patrick's tests were positive bilaterally. (*Id.*). She was assessed with lumbago, lumbosacral spondylosis without myelopathy, obesity, and nicotine dependence. (*Id.*). Mobic and Neurontin were discontinued and Claimant was started on the NSAID Lodine and referred for physical therapy. (*Id.*). X-rays of Claimant's thoracic spine taken on April 4, 2016 showed only mild degenerative change. (Tr. at 40).

On May 22, 2014, Claimant followed up at Community Care of West Virginia regarding her chronic lumbar pain. (Tr. at 815). Claimant reported that she attended

all ten of the physical therapy visits that were approved for payment, but she did not have any improvement; she had some benefit from Lodine, but had not taken it for two days. (*Id.*). She still had lumbar spine tenderness and pain with motion and positive Patrick's tests, but her reflexes and sensation were normal. (Tr. at 816). A MRI was ordered of Claimant's lumbar spine. (*Id.*). On June 5, 2014, the MRI of Claimant's lumbar spine showed mild lumbar spondylosis secondary to chronic change, but no disc herniation or spinal stenosis. (Tr. at 852).

On September 29, 2014, Claimant saw podiatrist Martin M. Mrozek, D.P.M., due to plantar heel pain that onset gradually over the past year. (Tr. at 785). Claimant described the pain as sharp, shooting, and stabbing and stated that it made it difficult for her to bear weight and caused her to limp. (*Id.*). Her gait was antalgic and limping. (Tr. at 786). She had some trace edema on examination and her x-ray showed a right plantar calcaneal spur. (*Id.*). Claimant was assessed with plantar fasciitis and instructed on strapping her foot/ankle, started on Medrol and Biofreeze 4%, molded for custom orthotics, and instructed on basic stretching. (*Id.*). Later in the year, on December 22, 2014, x-rays were taken of Claimant's cervical spine due to reported neck pain, but the results were normal. (Tr. at 942).

On March 3, 2015, Claimant presented to her primary provider for follow-up regarding her lower back pain and a new onset of cervical pain. (Tr. at 913). Claimant reported that she completed her course of physical therapy and it provided some benefit. (*Id.*). She could do some housework with moderation, but had numbness and tingling in her neck with radiculopathy in her left arm. (*Id.*). She had tenderness in her lumbar and cervical spine and pain elicited by motion in her lumbar spine, but motion did not elicit pain in her cervical spine. (Tr. at 916). Claimant was continued on

hydrocodone and a MRI was ordered. (*Id.*). Claimant's cervical spine MRI, taken on March 26, 2015, showed moderate stenosis and overall straightening of the normal cervical lordosis secondary to degenerative change. (Tr. at 978).

On July 23, 2015, Claimant again presented for follow-up with her primary care provider regarding her lumbar and cervical pain. She stated that her back pain was stable. (Tr. at 1142). Claimant reported that she was taking her medications as prescribed with moderate pain control and was able to function around the house and do things with her 13-year-old daughter. (*Id.*). Claimant had tenderness to palpation in her lumbar and cervical spine and positive Patrick's tests bilaterally. (Tr. at 1143). Claimant's prescriptions for Etodolac and Hydrocodone were renewed and she was referred to the Spine Center. (*Id.*).

The next month, Claimant was seen by Gary Barcinas, PA-C, under the supervision of Russell Biundo, M.D., at the WVU Department of Neurosurgery on August 21, 2015. Claimant reported that the pain that bothered her the most was in her low back and radiated to her hips. (Tr. at 1175). She also had pain in the thoracic region, chronic head numbness, bilateral shoulder pain, and numbness and tingling in her hands. (*Id.*). She stated that physical therapy was not making much of a difference and she had not yet tried injections. (*Id.*). On examination, Claimant had limited lateral rotation and extension in her cervical spine, as well as pain caused by lumbar extension and unloading. (Tr. at 1176). Her gait was slightly antalgic, but she had no difficulty with tandem walking and she had no focal deficits. (*Id.*). The assessment was that Claimant showed clinical signs and symptoms of cervical and lumbar spondylosis and articular facet disease and the plan was for Claimant to use physical therapy to strengthen and stabilize the muscles surrounding her spine and receive injections for

12

pain. (*Id.*).

On September 24, 2015, Claimant had an electromyography and nerve conduction study due to her complaints of numbness in her hands. The study showed mild bilateral median neuropathy in Claimant's wrists. (Tr. at 1171).

From January through August 2016, Claimant presented to Community Care of Bridgeport for pain management regarding her chronic low back, neck, and knee pain. (Tr. at 47-85). Her Patrick's test was positive bilaterally and she had tenderness to palpation in her spine and pain with motion, but she had a normal gait and normal motor strength. (Tr. at 48, 55-56, 60-61, 65-66, 70-71, 78-79, 84-85). During that time, on June 9, 2016, Claimant received a lumbar epidural steroid injection. (Tr. at 36).

### B. Opinion Evidence

On September 5, 2013, agency expert, Rabah Boukhemis, M.D., assessed Claimant's RFC based upon a review of Claimant's medical records. Dr. Boukhemis opined that Claimant was capable of work at the light exertional level, could stand/walk for a total of 6 hours in a work day, and could sit for a total of 6 hours in a work day. (Tr. at 164). In addition, Dr. Boukhemis found that Claimant was limited to occasional climbing of ramps/stairs/ladders/ropes/scaffolds and crawling and frequent balancing, stooping, kneeling, and crouching. (*Id.*). Dr. Boukhemis further assessed that Claimant had certain environmental limitations based upon the fact that she had vertigo. (Tr. at 164-65).

On December 14, 2013, James Binder, M.D., reviewed Claimant's records at the reconsideration level of review and found her RFC to be slightly more limited than Dr. Boukhemis. Specifically, although Dr. Binder agreed that Claimant could perform light work and sit, stand, and walk for 6 hours, he found that Claimant should never climb

ladders/ropes/scaffolds in addition to the restrictions imposed by Dr. Boukhemis. (Tr. at 189-90).

On July 15, 2015, Dr. Khorshad performed a one-time consultative examination of Claimant. Claimant could get on and off of the examination table and perform heel to toe walking, but she had difficulty sitting and squatting. (Tr. at 1102-03). Claimant had a tremor in both hands, reduced muscle strength in her upper extremities, positive Tinel's sign in both wrists, and limited range of motion in her lumbar spine, but her muscle strength, reflexes, and sensory modalities were well preserved. (Tr. at 1103-04). Noting Claimant's back pain, degenerative disc disease, and lumbar spondylosis, Dr. Khorshad opined that Claimant could never lift or carry over 10 pounds and could only occasionally lift or carry up to 10 pounds. (Tr. at 1108). Dr. Khorshad also found that Claimant needed to alternate between sitting and standing and could only stand for one hour, sit for 30 minutes, and walk for 30 minutes total in a work day. (Tr. at 1109). She could frequently perform activities that required the use of her hands except that she could only occasionally reach with her non-dominant left hand. (Tr. at 1110). Due to plantar fasciitis in her right foot, Claimant could frequently use her left foot for work activities, but only occasionally use her right foot. (*Id.*). Further, due to Claimant's history of vertigo and plantar fasciitis, Dr. Khorshad opined that Claimant could only occasionally perform postural activities, except she could never balance, and Claimant could not tolerate exposure to environmental factors. (Tr. at 1111-12).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v.

Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

Claimant disputes the RFC findings that she is capable of occasionally balancing and does not require a sit/stand option, arguing that the findings are not supported by substantial evidence and, therefore, the Commissioner's decision to deny benefits is flawed. (ECF No. 16 at 8). Claimant asserts that there is not sufficient evidentiary support for the ALJ's RFC determination, because the ALJ did not explain why she rejected the opinions of consultative examiner, Dr. Khorshad, who found that Claimant needed to alternate between sitting and standing and could never balance. (*Id.* at 11). Claimant notes that such functions are of critical importance given the vocational expert's testimony that a limitation to sitting for 30 minutes at a time or an inability to

balance would preclude work activity. (*Id.*).

Social Security Ruling 96-8p (SSR 96-8p) provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Among other functions, the ALJ must assess an individual's ability to sit, stand, and perform postural functions. *Id.* at *1; 20 CFR §§ 404.1545(b-d), 416.945(b-d). In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. Finally, the "RFC assessment must always consider and address medical source opinions" and if "the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ determined that Claimant could perform a limited range of sedentary work that included standing or walking for two hours and sitting for six hours in a work day; occasional balancing or reaching overhead; and no kneeling, crawling, or crouching. (Tr. at 103). However, the ALJ's decision did not adequately explain the basis for her RFC findings. (Tr. at 103-07). The ALJ summarized Claimant's allegations and medical evidence, remarked upon the conservative nature of her treatment, and analyzed her activities of daily living. (Tr. at 103-06). As to the opinion

evidence, the ALJ stated that she gave little weight to the state agency physicians'
September and December 2013 assessments that Claimant could perform light work
with frequent balancing, because subsequent evidence confirmed greater exertional
and postural limitations. (Tr. at 106). The ALJ gave partial weight to Dr. Khorshad's
2015 opinion, agreeing that "the limitation to sedentary exertion [was] supported by
the record," but disagreeing with his environmental limitations. Notably, the ALJ failed
to provide any rationale for discounting Dr. Khorshad's opinions that Claimant needed
to alternate between sitting and standing, could only stand for 1 hour and sit or walk
for 30 minutes in a work day, and could never balance. (Tr. at 106); *see* (Tr. at 1109-
10). Indeed, the ALJ did not even mention the need for a sit/stand option in her RFC
analysis despite opinions offered by the vocational expert regarding the extent to which
that limitation would reduce the sedentary occupational base. (Tr. at 143).

 The ALJ gave considerable weight to clinical notes confirming that Claimant
could walk normally, had normal muscle strength in the lower extremities, and
received only conservative treatment; however, the ALJ never explained how those
findings eliminated the need for a sit/stand option. *See Ebison v. Colvin,* No. 4:14-cv-
135-FL, 2015 WL 5725643, at *5 (E.D.N.C. Sept. 30, 2015) (holding that ALJ did not
adequately explain the RFC finding where "[t]he ALJ's opinion fails to provide any
reasoning connecting plaintiff's ability to stand or walk in an instant with plaintiff's
ability to stand or sit for a specified period of time" and explaining "[i]t is not apparent
that the ability to walk normally, or the presence of lower body strength, either alone
or in combination, has any bearing on the frequency with which plaintiff needs to
change position."). If the ALJ concluded that the sit/stand option recommended by Dr.
Khorshad was not supported by the record, the ALJ should have explicitly articulated

that finding and provided a rationale for it, so that the reviewing Court could determine whether the decision to reject a sit/stand option was supported by substantial evidence. Given the discrepancy between the ALJ's RFC finding and the opinion evidence, the ALJ was required to resolve the conflict, share her analysis, and cite evidentiary support for her conclusion. SSR 96-8p, 1996 WL 374184, at *7 (the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). Otherwise, this Court is faced with the task of reviewing the ALJ's summary of the medical evidence and applying it to the ALJ's findings in a *post-hoc* fashion in order to construct what may have been the ALJ's reasoning. Such retroactive speculation is not permitted. "Our circuit precedent makes clear that it is not [the Court's] role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

The basis for the ALJ's finding that Claimant could occasionally balance is equally unclear. The non-examining agency physicians concluded that Claimant could frequently balance and, as noted, Dr. Khorshad found, based on his consultative examination almost two years later, that Claimant could never balance due to her vertigo and plantar fasciitis. (Tr. at 164, 190, 1111). While the ALJ explained early in her decision that she did not find Claimant's vertigo to significantly affect her ability to do work-related activities, the ALJ did find Claimant's plantar fasciitis and heel spur to be severe impairments, i.e., those impairments more than minimally affected Claimant's ability to do basic work activities.  (Tr. at 98, 100). Nonetheless, the ALJ never addressed whether plantar fasciitis affected Claimant's ability to balance, nor did the ALJ resolve the relevant conflict on the issue.

Similarly, the ALJ never explained the basis of her determination that Claimant could stand and walk for 2 hours and sit for 6 hours in an 8-hour work day. (Tr. at 103). As noted, this finding certainly did not reconcile with the opinions of the non-examining agency physicians or with Dr. Khorshad, all of whom found Claimant to be either more limited or less limited than the ALJ. Furthermore, while the ALJ cited some evidence that may have supported her conclusions as to Claimant's ability to stand, walk, and sit, the ALJ never connected the evidence to her RFC determination.

The ALJ's findings as to Claimant's inability to crawl, kneel, or crouch and only occasionally reach overhead likewise were not explained in the ALJ's decision. While these limitations were more liberal than any of the agency experts found, and Claimant thus does not challenge such findings, the absence of explanation further substantiates the insufficiency of the ALJ's RFC discussion. The RFC finding may very well be supported by substantial evidence; however, the specific evidence relied upon by the ALJ for including certain limitations, and rejecting others, is not readily apparent from the record or the written decision. As previously stated, when reviewing an ALJ's decision, the Court is not permitted to "connect the dots" for the ALJ.

Moreover, as referenced by Claimant, the functions which the ALJ glossed over in her decision are of critical importance to the ALJ's step five conclusion that Claimant is capable of performing substantial gainful activity. During the administrative hearing, the ALJ questioned a vocational expert as to whether an individual with Claimant's assessed limitations, who could sit or walk for 30 minutes at one time and stand for 1 hour at a time, could work. (Tr. at 143). The expert responded that she did not think that such a person could be productive. (*Id.*). The expert also responded that there would not be any jobs available for a person with Claimant's assessed limitations

who could not perform postural activities, even if the person was only precluded from balancing. (Tr. at 144). Therefore, the undersigned cannot find that the ALJ's failure to discuss Claimant's ability to sit, stand, walk, and balance, or her reasoning for her RFC findings, was harmless error. *See Mitchell v. Colvin,* No. 5:13-cv-477-FL, 2014 WL 4436332, ay *2 (E.D.N.C. Sept. 9, 2014) ("A denial of benefits is not supported by substantial evidence if the ALJ 'has [not] analyzed all evidence and ... sufficiently explained the weight he has given to obviously probative exhibits.'") (quoting *Gordon v. Schweiker,* 725 F.2d 231, 236 (4th Cir.1984)); *also Lockhart v. Berryhill*, No. 1:16-CV-05216, 2017 WL 1505126, at *9 n.3 (S.D.W. Va. Mar. 21, 2017), *report and recommendation adopted*, 2017 WL 1528752 (S.D.W. Va. Apr. 25, 2017) (discussing harmless error in the context of social security appeals).

Ultimately, what is lacking in the ALJ's decision is her analysis of Claimant's physical impairments, the functional effects of such impairments, and a logical bridge between the ALJ's analysis of the evidence and the ALJ's conclusions. While the ALJ may have been able to explain the inconsistencies cited above and provide support for her decision, the Court "cannot begin to engage in a 'meaningful review' when there is nothing on which to base a review." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). As noted, the ALJ was required to perform an assessment of Claimant's basic work activities—such as the ability to sit, stand, balance, crawl, kneel, crouch, and reach—and then explain how the assessment resulted in the RFC findings. SSR 96-8p; 20 CFR §§ 404.1545(b-d), 416.945(b-d). In this case, the ALJ simply failed to tie her factual analysis to Claimant's RFC determination.

Therefore, because the ALJ's RFC discussion lacks a sufficient explanation of Claimant's physical limitations and the undersigned cannot conclude that the ALJ's

error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider, or elaborate on the discussion of, Claimant's physical impairments and functional limitations.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 16), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by

the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 24, 2018

Cheryl A. Eifert
United States Magistrate Judge